THE PEOPLE OF PUERTO RICO, Plaintiff and Appellee, *v.* LUIS DÍAZ RÍOS, Defendant and Appellant.

No. CR-66-429.     Decided October 20, 1967.

*Manuel López Carrillo* for appellant. *J. B. Fernández Badillo, Solicitor General,* and *Héctor R. Orlandi Gómez, Assistant Solicitor General,* for The People.

PER CURIAM: After having been convicted of the offense of rape by a majority of ten to two of the jury, Luis Díaz Ríos was sentenced on October 20, 1964, by the Superior Court, San Juan Part, to serve from three to ten years in the penitentiary.

On appeal he alleges that (1) "the verdict is contrary to the evidence"; (2) "the verdict is contrary to law . . . be-

cause the evidence of corroboration failed to establish the offense of rape in the manner required by law"; (3) the trial court erred in instructing the jury on corroboration of the facts constituting the offense of rape; and (4) said court erred in denying the motion for a new trial.

After examining the record of the case, we conclude that the assignments in question lack merit. In order to justify this adjudication, it is necessary to make a brief summary of the evidence which appears below.

The prosecutrix testified that she met appellant while she travelled from San Juan to Isabela, where she was a resident, when he boarded near Bayamón the "Motor Coach" in which she travelled. Answering questions of appellant, she gave him her name and the telephone number of her office in the Public Recreation and Parks Administration, in San Juan. Later he called her several times at the office, he obtained her home address, a boarding house owned by the witness Arcadia Cruz Cariles and the latter's mother, and there he visited her several times. Later she accepted an invitation to dine at the San José restaurant on the Caguas Highway. On another occasion they went dancing with another couple at another place. On the eve of San Juan's Day of 1964 the prosecutrix went with appellant to San José restaurant but since there were no lobsters there he insisted on going to "Richard" in Loíza Aldea. On their way back and since she expressed her wishes of returning because it was late, about 10:45 p.m., he took another road which he said to be a short cut; he stopped the car. He asked the prosecutrix if she loved him, to which she answered in the negative because "if he was nothing to me, I could not tell him that I loved him." When he lighted a cigarette, she noticed that his virile member was showing. She tried to run, but he grabbed her. He threatened her with a wrench telling her that "he was going to blow my brains out . . . thus we began the struggle, he struggled with me and I

with him, he pushed me against the seat; my head struck the steering wheel and then the dress, the zipper, on account of the force exerted, broke and immediately he, telling me, threatening me with the wrench and at the same time pressing his hands against my back, telling me that he was going to kill me, there and then, in the course of the struggle, he was able to pull off the girdle I was wearing . . . ." She added that "since the girdles I use are light, not tight, he pulled it off with his hands." The prosecutrix continued testifying that "the zipper opened and since I do not wear tight clothes, tight fitting, they went up with the struggle, I was kicking; he immediately grasped my hands, at the same time he threatened me, my right leg got stuck with the car and the : . . and at the same time he introduced his virile member in my parts." She said that some of her underwear was stained with blood.

After the former incidents, the defendant told her not to say anything because if she did, he would kill her. "He wanted me to drive, and since I could not drive in the state of nerves I was in, since I have a license he asked me if I did not know how to drive, he took the steering wheel from me and drove to San Juan to take me to the boarding house." When they arrived the prosecutrix opened the door of the boarding house and threw herself upon Arcadia (daughter of the owner of the boarding house), and she told her what had happened, telling it just as it is stated above. The latter told her: "You are all stained with blood, and then she immediately told me to wash my clothes so that the other girls would not notice what happened to me."

Next day she went to a doctor, accompanied by a friend, and the doctor practiced a medical examination. That night she lost a lot of blood.

On the evening of that day she went with Arcadia and another girl to Isabela and on the way, at the request of Arcadia, they stopped in Arecibo at defendant's home. That

at his house she stayed in the car, and the other two girls alighted. That Arcadia wanted to talk to Mr. Díaz "to give her an explanation before taking me home." That she did not talk to the defendant nor did they walk out of there together. Next day she returned to San Juan "We went to police headquarters, we tried to notify in Arecibo, but they refused to take the case because it belonged to San Juan."

Dr. Jordán testified, in essence, that from an examination of the genital organs of the prosecutrix it appeared that she had had recent sexual relations and also he could observe that the left arm of the prosecutrix suffered a "traumatism." That he issued a medical certificate on that date in which he only specified the condition of the genital organs of the prosecutrix.

Arcadia Cruz Cariles testified that she worked in a lawyers' office for four years as a receptionist. That she has known the prosecutrix for about a year, and the latter lodged in her house. That about one o'clock in the morning the prosecutrix arrived at her house "she threw herself upon me and told me what had happened to her"; that the prosecutrix was very nervous, that she told her that "Mr. Díaz had . . . abused her" and it was done by force. That the clothes of the prosecutrix were rumpled and her half-slip and panties were torn and stained with blood.

On cross-examination she testified that Mr. Díaz used to visit Miss Vargas "weekly, well, two or three times a week, more or less" for three or four months. That they used to go out frequently together, about twice a week.

She also testified that as a rule she did not wait for the girls of the boarding house when they went out at night, and that they had keys to the house. That when the prosecutrix arrived, she was sleeping. That she accompanied the prosecutrix, next day, to a female doctor but she was not in, that later the prosecutrix went to the doctor who examined her.

Later, in the afternoon of that day, they got into a car which took them to Arecibo, to the home of Mr. Díaz, they went out expressly to the home of Mr. Díaz in Arecibo. That the prosecutrix, another friend, and she went there. That she did not know where the defendant lived, but the prosecutrix did, that the latter indicated where it was and they went, that they got down from the car but did not enter the house because they found out that the defendant did not live there, but that it was a brother of the defendant who lived there. That at this place they were given the address of the defendant. That they went to that address, to his wife's house and did not find him.

When examined by the trial judge, she testified the following:

"Q. Listen, Doña Cayita, you mentioned that you went to a house in Arecibo which you discovered was the house of the brother.

A. Yes, sir.

Q. Was that the house that Miss Vargas indicated to you as the house of the defendant?

A. Yes, sir.

Q. Then, you say that you and the others went to another house, and that this one was the house of the defendant.

A. Yes, sir.

Q. Did you see the wife of the defendant?

A. Yes, sir.

Q. Did you know it was his wife?

A. No, sir.

Q. When did you find out this man was married?

A. At the moment that I arrived at his house, that I talked; that we talked with his wife.

Q. It was there that you knew for the first time that Luis is married?

A. Yes, sir."

She continues testifying that the defendant arrived at the place and the three of them saw him and spoke with

him, they talked for about half an hour on the patio of the house, the conversation was cordial.

When examined by the trial judge she also testified that in her opinion she believed that the defendant and the prosecutrix were in love. When examined by the prosecuting attorney, she testified that she had not seen them holding hands or kissing.

After this conversation with Mr. Díaz they called the prosecutrix's brother.

■ 1.—Appellant sets forth that the testimony of the prosecutrix is not credible because it was sufficiently contradicted by the testimony of Arcadia Cruz Cariles. Although a few discrepancies do in fact exist between the testimonies of these witnesses, they are not of such a nature as to merit our intervening with the weighing of the evidence made by the jury. Such discrepancies do not bind the jury to reject the entire testimony of the prosecutrix and particularly her statement of the criminal acts committed by appellant on her person. *People* v. *Orellano Gómez*, 92 P.R.R. 530 (1965) ; *People* v. *Nazario*, 87 P.R.R. 122 (1963) ; *People* v. *Aletriz*, 85 P.R.R. 621–624 (1962).

■ 2–3.—Appellant sets forth that the testimony of the prosecutrix was not corroborated by other evidence as required by Rule 154 of the Rules of Criminal Procedure. He also argues that the instruction of the trial court to the jury on the evidence of corroboration did not put the jury in a condition to pry into the testimony of Arcadia Cruz Cariles in order to determine whether by itself it connected appellant with the commission of the offense and also established the elements without further comment. *People* v. *Dueño Maysonet*, 94 P.R.R. 676 (1967) ; *People* v. *Matta Ortiz*, judgment of June 29, 1967; *People* v. *De Jesús Cruz*, 94 P.R.R. 170 (1967) ; *People* v. *Torres Robles*, judgment of March 10, 1967.

■ The instructions of the trial court contain all the questions of law necessary for the correct illustration and information of the jury. Said instructions were to the effect that the testimony of the prosecutrix had to be corroborated with other evidence on two essential points, that is, that the offense (the penetration) was by means of force and violence, maliciously and by force, that it must seek to establish and connect the defendant with the commission of the offense; that the testimony of the witness Arcadia Cruz Cariles, if believed beyond a reasonable doubt by the jury, would be sufficient evidence of corroboration.

■ 4.—The motion for a new trial (Rule 188 of the Rules of Criminal Procedure) was based on alleged new evidence which consisted of the sworn statements of the wife and the mother of appellant. The first is to the effect that the prosecutrix told the wife that appellant had seduced her without telling her he was married. Appellant alleges that the degree of animosity and tension which existed in his home deprived him of all communication with his wife, and it was after the verdict that he learned of this fact. The latter informs that on a Wednesday of June 1964 the prosecutrix came to the home of appellant's wife where the witness lived, and the prosecutrix told them that she had had sexual relations with appellant because he had told her that he was an unmarried man; during the conversation one of the friends of the prosecutrix, in order to prove that it had so occurred, said that she was going to show them the girdle that the prosecutrix left in appellant's automobile; that they looked for it in the trunk and did not find it; that the witness had forgotten this incident of the girdle till she remembered it after the verdict and after speaking to appellant's lawyer; that then they searched again in the vehicle and found the girdle under the seat; that it is the type of girdle which is difficult to put on and take off, and

that it is the same one which the prosecutrix said she had used on the occasion when appellant had raped her; that in speaking of her sexual relations with appellant the prosecutrix never said that he had forced her but that she had consented because she loved him and she wanted him to marry her.

The statement of facts in the first testimony is not new evidence since the husband arrived at his house almost immediately after the conversation between his wife and the prosecutrix, and he was informed of what the prosecutrix alleged and what she sought. He also knew about the girdle; he heard the testimony of the prosecutrix about said piece of clothing and he had the opportunity to comment on it with his mother who was in the courtroom having been sworn in as witness. Hence the conclusion of the trial court, that the evidence in question could have been discovered through the exercise of a reasonable diligence was justified. We conclude, therefore, that said court did not abuse its discretion in denying the motion for a new trial. *People* v. *Aguirre Torres*, 91 P.R.R. 862 (1965); *People* v. *Pardo Toro*, 90 P.R.R. 618 (1964).

In view of the foregoing, the aforesaid judgment rendered in this case by the Superior Court, San Juan Part, on October 20, 1964, will be affirmed.

Mr. Justice Belaval did not participate herein.